Filed 10/30/14  Hamp v. Harrison Patterson etc. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RICHARD HAMP, SR.<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>HARRISON PATTERSON O'CONNOR &<br>KINKEAD et al.,<br><br>    Defendants and Respondents. | D064453<br><br><br><br>(Super. Ct. No. 37-2011-00054272-<br> CU-PN-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy

Taylor, Judge.  Affirmed.

Richard Hamp, Sr., in pro. per., for Plaintiff and Appellant.

Noon & Associates, Timothy S. Noon and Julianne Mizer, for Defendants and

Respondents.


Richard Hamp, Sr., sued his attorney, Harry Harrison, and Harrison's law firm

(collectively Harrison) for legal malpractice, breach of fiduciary duty, and fraud on the

court.  The court initially granted Harrison's anti-SLAPP motion and entered judgment in

Harrison's favor.  However, this court reversed the judgment based on its conclusion that

Hamp's complaint was not subject to the anti-SLAPP statute. Because we found the statute inapplicable, we did not reach the issue whether Hamp met his burden to show a probability of prevailing on his claims.

On remand, Harrison successfully moved for summary judgment. Hamp appeals, contending there are triable issues of fact on two of the causes of action: malpractice and breach of fiduciary duty. We reject these contentions and affirm the judgment.

FACTUAL SUMMARY

Harrison represented Hamp in a lawsuit against Hamp's former employer, Hanson Aggregates Pacific Southwest, Inc. (Hanson Pacific), in which Hamp alleged he was unlawfully terminated because of a spinal disability. During the lawsuit, Harrison defeated Hanson Pacific's summary adjudication motion on Hamp's wrongful termination claim based on evidence showing Hanson Pacific failed to make efforts to accommodate Hamp's disability. Less than one year later, Harrison withdrew from the representation with the court's approval. Hamp retained a successor attorney, but the court ultimately found in Hanson Pacific's favor on the accommodation issue and entered judgment for Hanson Pacific. Hamp then sued Harrison, alleging Harrison's fraud, breaches of his fiduciary duties, and failure to adhere to professional standards caused the unfavorable result and other damages. The court granted Harrison's summary judgment motion.

Hamp challenges this ruling on appeal. To understand the appellate issues, we first summarize the relevant facts pertaining to Hamp's underlying employment action, then describe Hamp's claims in his current complaint, and finally set forth the parties' submissions and arguments in the summary judgment proceeding.

2

*Underlying Employment Action*

Hamp worked as a ready-mix concrete driver for Hanson Pacific. The job includes driving and delivering concrete material. The delivery responsibilities require the driver to load and unload concrete material through heavy chutes that must be removed from the truck frame, attached to the rear of the truck, and then reloaded on the truck after the delivery is complete.

In July 2004, Hamp injured his back at work. He filed a workers compensation claim and was on medical leave for the next several years.

In October 2006, Hamp's treating orthopedist, Dr. Bruce Van Dam, prepared a report stating Hamp "continues to be bothered by pain in his lower back," and Hamp "has reached a permanent and stationary status." Dr. Van Dam opined that "Hamp has a spinal disability precluding heavy lifting, repeated bending and stooping" and that Hamp "lost approximately half of his pre-injury capacity" for these tasks. Dr. Van Dam stated he could not evaluate the possibility of vocational rehabilitation because he did not have a job description "to formulate an opinion" on this subject.

The next month, Hanson Pacific made a decision to terminate Hamp based on its asserted conclusion that Hamp's disabilities (as described in its workers compensation carrier's report) precluded him from performing the key functions of his job (including the heavy lifting and bending requirements). However, Hanson Pacific did not send a letter to Hamp notifying him of this decision.

About seven months later, in June 2007, Dr. Van Dam submitted a certification to the Employment Development Department substantiating Hamp's continuing disability to

3

support Hamp's eligibility to receive state disability benefits.[1] In the certification, Dr. Van Dam stated that Hamp "can't perform lifting required of job" and that "treatment [has been] denied by insurance carrier."

On November 2, 2007, Dr. Van Dam submitted a supplemental certification to the Employment Development Department. In this certification, Dr. Van Dam stated that Hamp's condition prevented him from returning to work because he "can't do the lifting/bending required," and stated that Hamp's condition was "permanent."

Shortly after, Hamp contacted Hanson Pacific and inquired about his employment status. At that time, he first learned that he had been terminated. The next month, in December 2007, Hanson Pacific wrote a letter to Hamp confirming his 2006 termination and stating that it had been willing to seek to accommodate his disabilities before it terminated him, but Hamp never responded to its inquires and letters. Hamp denied this version of events and maintained that he had asked for accommodations but Hanson Pacific never responded to his requests.

The next month, in January 2008, Hamp retained Harrison to bring a lawsuit challenging his employment termination. In May 2008, Harrison (on Hamp's behalf) filed a complaint asserting causes of action for wrongful termination, employment discrimination, failure to provide reasonable accommodation, harassment, and intentional infliction of emotional distress.

---

[1] A person is eligible to receive state disability benefits if a timely application is filed, which must include a certificate signed by a qualified physician to substantiate the disability. (Unemp. Ins. Code, §§ 2627, subd. (d), 2708, subds. (a)(1) & (a)(2).)

During November 2008 and January 2009, Hanson Pacific's attorneys took Hamp's deposition over three different days.  In his deposition testimony, Hamp acknowledged he still had back problems and never received medical clearance to return to his ready-mix driver job.  When asked if *he* thinks he is "physically capable of returning to work as a ready mix driver . . . ," Hamp responded:  "I can't answer that.  I don't know."  He said he is not sure whether the problem would "flare[ ] up" if he returns to his job.

When Hanson Pacific's attorney asked Hamp about Dr. Van Dam's certification in June 2007 that he was not capable of returning to work because he could not perform the physical duties of the ready-mix driver job, Hamp indicated he agreed with that statement:

"Q:     In fact, in June of 2007, you weren't capable of performing the job duties of a ready mix driver, correct? At least that's what you were representing to the [Employment Development Department], correct?"

"A:     That's—yes."

"Q:     And that was the truth, right?"

"A:     Yes."

Hamp provided similar answers regarding the November 2007 certification, agreeing that at that time he was "not capable of performing the regular and customary work of a ready mix driver[.]"  Hamp also said that although he can bend down, he has pain when doing so, and that he can squat and stoop down only on a "limited basis."  Hamp testified that ready-mix drivers are generally required to lift 50-pound chutes that

are carried on the trucks, but that Hanson Pacific also has lighter chutes (33 pounds) that can accommodate a lifting disability.

During Hamp's deposition, Hanson Pacific marked as exhibits two ready-mix driver job descriptions and questioned Hamp about the job duties set forth in these descriptions.[2] These undated job descriptions were essentially identical; each was entitled "READY MIX DRIVER JOB DESCRIPTION," and identified a Hanson Pacific related entity. We shall collectively refer to these job descriptions as the First Job Description.

Several months after Hamp's depositions, on April 28, 2009, Hanson Pacific's attorney produced a new and different job description as a supplement to its prior document production. This job description is entitled "CONCRETE MIXER TRUCK DRIVER." The document indicates it was last updated on July 2006 (several months before Hamp was terminated) and it identifies the company as Hanson Aggregates Pacific Southwest Region (the name of Hamp's employer with the word "Region" added). This job description will be referred to as the Third Job Description.

The First Job Description and the Third Job Description contain similar depictions of the ready-mix concrete driver job. But they are in a different format (the First Job Description is solely in narrative form and the Third Job Description contains a chart). Additionally, there are some differences in the identified physical requirements for the job. The First Job Description identifies the physical requirements as follows: "While

_____

[2]    Because the job descriptions are a central foundation for Hamp's current claims, we discuss the relevant documents in some detail.

6

performing the duties of this job, the employee is *regularly* required to sit, use hands to handle tools, or controls; reach with hands and arms; climb or balance; and *stoop or crouch. . . .* [¶] The employee must *regularly* lift and/or move *up to 50 pounds*." (Italics added.) The Third Job Description states: "To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions." A list of physical requirements then follows, which provides that the employee must be able to lift 76-100 pounds for "0-1" hours and lift 26-50 pounds for "1-2" hours. It also provides that the employee must be able to bend over, crawl, crouch, and kneel for "0-1" hours.

The day after producing the Third Job Description, on about April 29, 2009, Hanson Pacific moved for summary judgment. Hanson Pacific argued the undisputed evidence established Hamp could not perform the job of a ready-mix driver, and therefore it properly terminated him. In support, it proffered the declaration of Cheryl Hurst, Hanson Pacific's human resources manager, who attached the Third Job Description *and* specifically described the driver job as requiring the employee to lift heavy loads and to regularly stoop and bend and crouch. Hurst's declaration states in part:

> "As a RMC [ready mix concrete] driver . . . , Plaintiff's job duties required regularly lifting and/or carrying approximately 50 pounds (and occasionally up to 100 pounds), bending, stooping or crouching, prolonged sitting, reaching, standing and/or walking. A true and correct copy of the RMC truck driver job description identifying the physical requirements for the job is attached [the Third Job Description].

7

" . . . As a RMC truck driver, Plaintiff was also required to climb onto elevated work areas (fenders, cab steps, drum inspection platform ladders), crawl on the ground (inspecting under the truck, examining brakes, hoses, etc.), and pull open the truck hood. RMC trucks are loaded and unloaded utilizing mechanical controls, which often require attachment of unloading chutes. These chutes are usually made of steel and weigh, on average approximately 50 pounds or more. The lightest chutes available at Hanson weigh, on average, more than 33 pounds, and up to 38 pounds.

[¶] . . . [¶]

" . . . Given the nature of the job, there were no reasonable accommodations available that would allow Plaintiff to perform the job of a RMC truck driver. Plaintiff's job duties required him to lift and mount heavy chutes on a daily basis, often multiple times per day. . . . Plaintiff was also required to climb in and out of the truck several times per day and to bend and stoop to reach various parts of the truck in order to perform his daily job duties. Since the cement trucks are operated by a single driver, there was no one available to relieve Plaintiff of these job duties."

Relying on this declaration *and* Hamp's deposition testimony in which he admitted he was unable to fulfill the job requirements, *and* the Third Job Description, Hanson Pacific argued it had been justified in terminating Hamp because he could not perform the essential duties of his ready-mix driver job.

In opposing the summary judgment motion, Harrison (on Hamp's behalf) did not dispute Hanson Pacific's claim that at the time of the termination Hamp could not perform the essential requirements of his former job (including the requirement that he occasionally lift up to 100 pounds), nor did he challenge the accuracy of the Third Job Description or suggest the First Job Description applied instead of the Third Job Description. Instead, Harrison admitted Hamp's disability and opposed the summary

8

judgment motion on the alternate basis that Hanson Pacific violated legal duties by terminating Hamp's employment while he was on disability leave *without making any attempt to accommodate his disability*. In the response to the statement of undisputed facts, Harrison also disputed Hanson Pacific's claim it could not place Hamp in his former position with reasonable accommodations.

In support of these arguments, Harrison submitted evidence reflecting Hanson Pacific's failure to communicate with Hamp while he was on disability leave and its failure to send him a letter notifying him of his job termination. Harrison also submitted the declaration of Dr. Van Dam who stated he never received a job description for Hamp's job to permit him to "opine[ ] on whether Mr. Hamp was a candidate for vocational rehabilitation . . . ."

In a tentative decision, the court denied summary adjudication on Hamp's wrongful termination, discrimination and failure to accommodate claims. The court reasoned there were triable factual issues on the question whether Hanson Pacific could have accommodated Hamp's disability by placing him in another job.

At the hearing, Hanson Pacific's counsel urged the court to grant the summary judgment motion because the evidence showed there were no other available jobs that would accommodate Hamp's disability. Harrison disputed these points and argued that the court's ruling was correct because there was no dispute that Hamp was disabled, and Hanson Pacific had not properly engaged in an interactive accommodations process.

After taking the matter under submission, the trial court issued a final ruling adhering to its tentative conclusions. It granted Hanson Pacific's summary adjudication

9

motion on Hamp's claims for harassment and intentional infliction of emotional distress. However, the court denied summary adjudication on Hamp's claims for employment discrimination, failure to reasonably accommodate, and wrongful termination. The written order stated that although there was no dispute that Hamp could not perform his former job and there were no reasonable accommodations Hanson Pacific could make to allow him to perform his former job, Hanson Pacific had not met its burden to show Hamp could not perform any other available job.

Within the next several months, Hanson Pacific's counsel took Dr. Van Dam's deposition. During the deposition, Dr. Van Dam testified he did not know in September 2006 whether Hamp was capable of returning to his job because Dr. Van Dam had not been provided with a job description. Dr. Van Dam also testified that Hamp was physically capable of lifting 26 to 50 pounds, but "[o]nce you start to get 50 pounds or greater, then I think there's a problem." He said that once "[Hamp] gets above [50 pounds], then I think . . . unless the employer's willing to modify the job, he can't do that. That's a pretty easy call. [¶] The other one is that he has to stoop and bend and get under the truck and that kind of stuff, and I think that's problematic too. So, we don't even need to go any farther, as far as I'm concerned, and say, you know, he really can't do that job, because those are essential functions of the job." When asked whether Hamp was "capable of bending and stooping on a regular basis," Dr. Van Dam answered "Probably not." Dr. Van Dam also testified that Harrison sent him the Third Job Description earlier that morning, and based on *that* job description, he has concluded that Hamp "is incapable of performing the job of a ready-mix driver."

10

About five or six months later, in February 2010, Harrison wrote an email to Hamp explaining the weaknesses in his case and urged Hamp to accept Hanson Pacific's $8,000 settlement offer. After Hamp refused to accept this offer, the attorney-client relationship broke down. Several months later, in May 2010, Harrison obtained the court's approval to withdraw from the representation. Shortly after, Hamp obtained new counsel. The trial date was continued to September 2010.

In June 2010, Hanson Pacific filed a second summary judgment motion on Hamp's remaining claims. Hanson Pacific argued the court had already determined Hamp could not perform the essential duties of the ready-mix driver job, citing to Harrison's earlier concession in the first summary judgment proceedings, and contended the undisputed evidence showed there were no jobs available with accommodations.

In response, Hamp's new counsel did not present evidence showing Hamp was able to perform the ready-mix driver job without accommodation, but argued triable issues of fact exist because the evidence showed Hamp could be accommodated in his prior job by using alternative, lighter chutes available on some of the ready-mix trucks, and/or he could be accommodated in another similar job.

In August 2010, the trial court granted Hanson Pacific's second summary judgment motion, finding Hamp had not established he could perform any of the alternative jobs open at the time Hanson Pacific discharged him. The trial court did not expressly discuss the issue whether Hamp could have performed his former job with a reasonable accommodation. The court stated: "Defendant more than adequately makes a sufficient showing for the grant of summary judgment on plaintiff's complaint. In that

11

regard, defendant's [summary judgment motion] establishes that plaintiff did not qualify for and was unable to perform the essential job functions of the other available positions during the relevant time period, with or without a reasonable accommodation. [¶] . . . [¶] Moreover, plaintiff fails to show any reasonable accommodation exists. . . ."

*Hamp's Complaint Against Attorney Harrison*

About nine months after judgment was entered against him on his wrongful termination claims, Hamp filed an action against Harrison, alleging breach of fiduciary duty and attorney malpractice.[3] The primary focus of the complaint was on the Third Job Description produced by Hanson Pacific in the underlying lawsuit. Hamp alleged this job description "was entirely fraudulent and was produced . . . to defraud the court and prejudice the proceedings against the interest of [Hamp]."

On the breach of fiduciary duty cause of action, Hamp alleged Harrison acted negligently or intentionally and maliciously in relying on, or failing to protect him from, the alleged fraudulent Third Job Description and/or "aided and abetted the fraud perpetrated" by Hanson Pacific's attorneys. Hamp additionally alleged that Harrison "effectively abandon[ed] him" after the first summary judgment ruling, which compounded the "fraud upon the court and prevent[ed] HAMP from effectively bringing his case before the court."

On the malpractice cause of action, Hamp alleged Harrison failed to identify and seek exclusion of the "fraudulent" job description, which was allegedly the "cause and

---

3    Hamp also brought a claim for intrinsic/extrinsic fraud, but does not challenge the court's ruling on this claim. We thus do not discuss this claim in this opinion.

central debilitating piece of evidence" upon which the court denied the first and second summary judgment motions.

*Harrison's Anti-SLAPP Motion*

Harrison moved to strike Hamp's complaint under the anti-SLAPP statute. The trial court granted the motion. Hamp then successfully appealed the judgment. (*Hamp v. Harrison Patterson O'Connor & Kinkead, LLP* (Dec. 18, 2012, D061276).) In an unpublished opinion, we concluded the anti-SLAPP statute did not govern Hamp's complaint because the claims were based on Harrison's alleged incompetent representation of Hamp's interests and not on Harrison's protected petitioning activity. (*Ibid.*) We thus reversed the judgment without reaching the issue whether Hamp met his burden to show a probability of prevailing on each of his claims.[4]

*Harrison's Summary Judgment Motion*

On remand, Harrison moved for summary judgment, arguing Hamp could not recover on his claims as a matter of law because: (1) the Third Job Description was not fraudulent; (2) Harrison's withdrawal from the case was proper and there was no abandonment; (3) Hamp cannot prove Harrison breached an applicable duty of care; and (4) Hamp cannot prove Harrison was the cause of Hamp's damages, i.e., that Hamp would have prevailed in the underlying case if Harrison had challenged the Third Job Description and/or continued to represent Hamp.

---

[4] In support of his contentions in the current appeal, Hamp discusses various comments made by the appellate justices during the oral argument in the anti-SLAPP appeal. These comments are inapplicable here because the factual records in the two appeals are different and we did not reach the merits of Hamp's claims in the prior appeal.

13

In support of these contentions, Harrison submitted his own declaration in which he stated his representation of Hamp was "in accord with the standard of care for attorneys practicing in San Diego County" and with the applicable professional conduct rules, and that he "represented Mr. Hamp's interests and salvaged his claims through summary judgment so that he could continue to pursue his case, ultimately with successor counsel." Harrison further stated that each of the job descriptions was "produced by Hanson [Pacific] as business records in the ordinary course of discovery . . . . [¶] . . . There was no indication the job descriptions, including the Third Job Description, were fraudulently created for the purpose of this litigation" and "[a]t no time did I participate, aid or abet or conspire with opposing counsel . . . to perpetuate a fraud upon the [court] to harm Mr. Hamp's interests." Harrison also discussed the circumstances under which he withdrew from the case with the court's approval (these facts will be detailed in the Discussion section below).

Harrison also supported his summary judgment motion by submitting evidence that regular bending and crouching were required tasks under either the First Job Description or the Third Job Description and that Hamp was not capable of bending and stooping down on a regular basis. This evidence included the three written job descriptions, human resources manager Hurt's declaration in the underlying lawsuit (summarized above), and the deposition testimony of Dr. Van Dam and Hamp (summarized above).

Harrison also submitted the declaration of Hanson Pacific's attorney in the wrongful termination lawsuit, in which she said: "The [Third Job] Description was

14

produced [during discovery] as an existing business record of the company and not fraudulently prepared for the defense of the lawsuit.  It was properly authenticated as valid and as a true and correct copy of Hamp's job description . . . ."

In opposing the summary judgment motion, Hamp argued that factual issues exist on each of his claims because:  (1) the First Job Description was the applicable job description and Harrison was aware or should have been aware of this fact; (2) Hamp was capable of performing the essential duties identified in the First Job Description; and (3) if Harrison had challenged the Third Job Description and advocated for his returning to his prior job, he would have prevailed on the second summary judgment motion with his successor counsel and would be entitled to proceed to trial on the issue whether he was physically able to perform his former job (with the lighter chute accommodation).

With respect to the validity of the Third Job Description, Hamp proffered the declaration of union president Gary Knight, who stated the First Job Description is the only accurate ready-mix driver job description on file with the union and any changes to the job description must be requested in writing and approved by the parties.  Hamp also submitted the union's letter to all union members (dated after Hamp filed the current malpractice lawsuit) making clear the union's position that the First Job Description is the accurate description of the ready-mix driver job.

Hamp also submitted his own declaration in which he stated that:  "Ready Mix Drivers are **not** required to repeatedly bend, repeatedly stoop, repeatedly squat or repeatedly lift objects daily while working in our profession."  He also stated that the "cement truck Chutes, by far, are the heaviest items a Ready Mix Driver must lift daily

15

(when needed) and they weigh approximately 33 to 48 lbs new." Hamp additionally said that after Hanson Pacific produced the Third Job Description, "Harrison never once notified me or my doctor or ever contacted my Union to verify its use . . . ."

Hamp also produced the declaration of Chris Besanson, a Hanson Pacific ready-mix driver and a union steward. Besanson said the First Job Description is the applicable job description for the ready-mix driver job. He acknowledged that a driver must stoop and squat during the job, but denied there are any requirements that drivers "repeatedly . . . bend, squat, or lift." He said the "cement chutes are the heaviest items a driver must lift and they weigh between 33 and 48 pounds," and when he was previously injured, Hanson Pacific provided him with a lighter chute weighing 33 pounds.

Hamp also submitted the declaration of James Wright, another Hanson Pacific ready-mix driver, who said he has never been required to "repeatedly bend, stoop, squat or lift" as part of the job. He also said a driver is not required to lift more than 50 pounds, and "[d]uring a regular 8 to 10 hour work day shift . . . , I might handle the Chutes a total of 24 times, or less, depending on [the job] site requirements. . . ."

Hamp additionally submitted a new declaration of Dr. Van Dam, who reconfirmed his prior opinions that Hamp still cannot lift more than 50 pounds without accommodation and cannot repeatedly bend or stoop on the job. But Dr. Van Dam also stated that if he had been shown the First Job Description at his August 2009 deposition (which occurred after the court denied (in part) the first summary judgment motion), he would have opined that Hamp *could* return to the ready-mix driver job. He explained: "The Ready Mix Driver J.D. states that a driver must lift *up to 50 pounds,* but not over. It

16

also states that Mr. Hamp must be able stoop/crouch, which he can, albeit not repeatedly. Therefore, Mr. Hamp can do that job. The physical requirements stated in the [First Job Description and Third Job Description] are significantly different. Consequently, my opinion regarding the ability of Mr. Hamp to return to his pre-injury employment is now different than at the time of my deposition."

Hamp also submitted a declaration of Hanson Pacific's human resources manager Hurst that was filed in connection with Harrison's anti-SLAPP motion. In the declaration, Hurst explained the different purposes of the First and Third job descriptions. She said the First Job Description is "provided to job applicants and employees typically at the beginning of their employment . . . [to] provide a general overview of the [ready mix driver] job requirements and expectations," whereas the Third Job Description "is a more detailed job description which provides a breakdown of the physical requirements of the RMC Driver position." Hurst said Hanson Pacific uses the latter job description "to assess an employee's ability to perform the essential functions of his or her position and determine whether a possible accommodation exists" and that Hanson Pacific will "sometimes provide a copy of this job description to health care providers for use in determining whether an employee can perform the essential functions of his or her position with or without accommodation."

*Summary Judgment Ruling*

After considering the papers and conducting a hearing, the court granted Harrison's summary judgment motion, finding the undisputed facts showed Hamp could

17

not prevail on any of his causes of action.  The court also overruled the parties' numerous evidentiary objections.

## DISCUSSION

### I. *Summary Judgment Review Standards*

A summary judgment motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c).)  A triable issue of material fact exists only if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

The issues on a summary judgment motion are framed by the pleadings.  (*Sweat v. Hollister* (1995) 37 Cal.App.4th 603, 607.)  A moving defendant has the initial burden to show one or more elements of the plaintiff's cause of action cannot be established, or that there is a complete defense to the claim.  (*Garcia v. W&W Community Development, Inc.* (2010) 186 Cal.App.4th 1038, 1041.)  If the defendant meets this burden, the burden shifts to the plaintiff to show the existence of a triable issue.  (*Ibid.*)  The plaintiff may not rely upon the pleading allegations but instead must set forth *specific facts* based on *admissible evidence* showing a triable issue of material fact on the cause of action.  (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476-477; *Trujillo v. First American Registry, Inc.* (2007) 157 Cal.App.4th 628, 635.)

18

"Because a summary judgment denies the adversary party a trial, [the motion] should be granted with caution."  (*Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1305.)  We consider all of the evidence and inferences reasonably drawn from the evidence, and view the evidence in the light most favorable to the opposing party.  (*Aguilar, supra*, 25 Cal.4th at p. 843.)  We review a summary judgment de novo and are not bound by the trial court's stated reasons.  (*Blue Shield of California Life & Health Ins. Co. v. Superior Court* (2011) 192 Cal.App.4th 727, 732.)  We evaluate the court's determination, and not its underlying rationale.  (*Ibid.*)

Under these principles, we examine the court's summary judgment ruling on the two challenged causes of action:  professional negligence and breach of fiduciary duty.

II.  *Professional Negligence Cause of Action*

A.  *Overview*

To prove a professional negligence claim, a plaintiff must show:  " '(1) the duty of the attorney to use such skill, prudence and diligence as members of the profession commonly possess; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage.' . . ."  (*Wiley v. County of San Diego* (1998) 19 Cal.4th 532, 536.)  " 'The attorney is not liable for every mistake he may make in his practice; he is not, in the absence of an express agreement, an insurer of the soundness of his opinions . . . ; and he is not liable for being in error as to a question of law on which reasonable doubt may be entertained by well-informed lawyers.' "  (*Kirsch v. Duryea* (1978) 21 Cal.3d 303, 308 (*Kirsch*).)

19

Hamp contends the court erred in granting summary judgment on his professional negligence claim because the evidence shows the Third Job Description was fraudulent, and Harrison breached his professional duties by failing to recognize and disclose the fraud. Hamp alternatively argues that even if the Third Job Description was not fraudulent, Harrison breached his professional duties by conceding the validity of the job description and/or failing to object to the description as invalid or inaccurate. According to Hamp, Harrison's acceptance of the Third Job Description during the summary judgment proceedings precluded Hamp from later prevailing on a claim that he was capable of performing the essential functions of his prior job and thus caused him to be unsuccessful in the second summary judgment motion.

The first argument is factually unsupported. There was no evidence that the Third Job Description was fraudulent, and/or that Harrison knew or should have known it was fraudulent. With respect to the second argument, Harrison met his burden to show Hamp could not prove the duty and causation elements of his malpractice claim, and Hamp did not present necessary expert evidence to raise a triable issue of fact that Harrison's conduct breached the applicable professional duty of care and caused Hamp's claimed damages.

B. *Evidence Did Not Support Claim that Third Job Description Was Fraudulent*

In moving for summary judgment, Harrison submitted evidence showing Hanson Pacific produced the Third Job Description during discovery as part of its obligation to disclose all job descriptions in its possession for Hamp's ready-mix concrete driver job and the job description appeared on its face to be valid (containing a date close to the

20

relevant events and containing a printed identification of Hanson Pacific and the ready-mix job). Additionally, Harrison submitted evidence showing this written job description is consistent with the actual requirements of the job. These facts satisfied Harrison's summary judgment burden to show the document was not an intentionally false or fraudulent document.

The burden thus shifted to Hamp to show the document was fraudulent and Harrison knew or should have known it was fraudulent. To support this claim, Hamp produced information from his union supporting that the First Job Description was the applicable job description because it was attached as an addendum to the existing union contract and changes to the union contract must be in writing. Hamp also produced a union letter written after he filed his malpractice complaint that workers should report to the union if Hanson Pacific attempts to rely on the Third Job Description. He also produced declarations from coemployees who indicated that the First Job Description was the governing description because it had been approved by the union.

These facts do not support a reasonable inference that the Third Job Description was fraudulent or was otherwise proffered in bad faith. Hanson Pacific had the duty to produce this document in response to a request for all ready-mix driver job descriptions in its files, and Hanson Pacific produced a declaration of a human resources employee who confirmed the accuracy of this description. Even assuming the union did not authorize the job description, this fact does not show Hanson Pacific committed fraud by producing the description or by relying on it to support its summary judgment/adjudication motion. As stated by the trial court, "the logical link Hamp insists

21

upon—'not union authorized and therefore fraudulent'—is never explained" nor supported.

Moreover, there are no facts showing Harrison was aware or should have been aware of the union's claims regarding the job description, and/or that Harrison conspired with Hanson Pacific to mislead the court as to the true job description. Hamp's claim that Hanson Pacific was acting in bad faith and/or that his attorney should have ferreted out the alleged "fraud" is not based on any admissible evidence. An opposition to summary judgment is insufficient to create a triable factual issue when it is based on inferences that are not reasonably supported by the facts. (*Wiz Technology, Inc. v. Coopers & Lybrand LLP* (2003) 106 Cal.App.4th 1, 11.) Under well-settled summary judgment law, "[a]n issue of fact . . . is not created by 'speculation, conjecture, imagination or guess work.' [Citation.]" (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196.)

C. *Absence of Expert Testimony Barred Hamp's Claim*

Hamp's second theory is that even if the Third Job Description was not fraudulent, Harrison acted below professional standards by failing to object to this description on the basis that the First Job Description reflects the true and correct description of Hamp's ready-mix driver job. According to Hamp, if Harrison had established that the First Job Description sets forth the accurate job standards, Hamp would have been able to establish (through Dr. Van Dam's recent declaration) that he could have returned to his ready-mix driver job despite his disabilities. Hamp thus argues that he presented sufficient evidence to create a triable issue of fact on the malpractice claim.

22

The primary flaw in this argument is that Hamp did not present any expert evidence to support his theory that Harrison breached his duty by failing to challenge the Third Job Description. Generally, expert witness testimony is required in a professional negligence case to establish the applicable standard of care, whether that standard was met or breached by the defendant, and whether the defendant's negligence caused the plaintiff's damages. (See *Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1542; *Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229, 1238 (*Unigard*).) " 'Expert evidence in a malpractice suit is conclusive as to the proof of the prevailing standard of skill and learning in the locality and of the propriety of particular conduct by the practitioner in particular instances because such standard and skill is not a matter of general knowledge and can only be supplied by expert testimony.' " (*Lipscomb v. Krause* (1978) 87 Cal.App.3d 970, 976; see 1 Witkin, Cal. Procedure (5th ed. 2008) Attorneys, § 291, p. 367.)

Hamp seeks to avoid this rule by relying on a narrow exception where " 'the conduct required by the particular circumstances is within the common knowledge of the lay[person].' " (*Landeros v. Flood* (1976) 17 Cal.3d 399, 410; *Unigard, supra*, 38 Cal.App.4th at p. 1239.) Under this exception, if "the attorney's performance is so clearly contrary to established standards that a trier of fact may find professional negligence without expert testimony, it is not required." (*Day v. Rosenthal* (1985) 170 Cal.App.3d 1125, 1146; *Wilkinson v. Rives* (1981) 116 Cal.App.3d 641, 647-648.) If "the lay person's common knowledge includes the conduct required by the particular

23

circumstances[,]" the "general rule" requiring expert testimony does not apply. (*Unigard, supra*, 38 Cal.App.4th at p. 1239.)

Hamp contends the alleged malpractice falls within this exception because "[a]ny juror [would] understand that Harrison made no attempt to [dispute Hanson Pacific's] facts regarding Hamp's own job and the jury could [therefore] find negligence without expert assistance." He says that Harrison's conduct in this case "is as plain as blowing a statute of limitations." Hamp asserts that Harrison's representation fell below the standard of care because he did not "defend[ ] or protect[ ] [his] job, and instead conceded that his disability precluded him from performing his preinjury job. " He maintains that "[a]ny thinking attorney would at the very minimum" have submitted the First Job Description in support of an argument that Hamp can return to his preinjury job.

These arguments are unsupported. The record of the underlying action shows Harrison's litigation strategy was to acknowledge that Hamp was disabled and could not perform the ready-mix job without accommodation, and to use these facts to support the theory that Harrison considered the strongest: Hanson Pacific breached legal duties by failing to engage in the legally-required interactive process to identify a position that would accommodate Hamp's disability. Under this strategy, the difference between the First Job Description and the Third Job Description was not material. Even assuming Hamp could not return to the ready-mix driver job, there is California law supporting that an employer must engage in an interactive process to determine whether any reasonable accommodation is possible. (See *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424-425.)

24

Contrary to Hamp's assertions, whether Harrison's strategy was a competent one is not a matter of common knowledge. An expert witness was necessary to evaluate whether this litigation strategy was within the range of reasonable tactical decisions, particularly given Hamp's concessions at his deposition and his prelitigation admissions that he could *not* engage in the heavy lifting *or* repeated stooping and bending required for the job, and Dr. Van Dam's prelitigation certifications that Hamp could not perform the job. Additionally, there was evidence showing Hanson Pacific did not notify Hamp of his termination until one year after it occurred. Under these asserted facts, the applicable professional standards by which to judge Harrison's litigation decisions require the specialized knowledge of an employment law expert. Only an expert could give the trier of fact a proper assessment of whether the decision to focus on accommodation and to concede disability with respect to Hamp's job fell below the standard of care. Expert testimony is required where an attorney is accused of malpractice based on tactical trial strategies. (See *Kirsch, supra*, 21 Cal.3d at pp. 308-309; see also *Lipscomb v. Krause, supra*, 87 Cal.App.3d at pp. 973-976.)

Further, the fact that Hamp did not approve, or would not have approved, of Harrison's decision to concede the disability issue does not create a triable issue of fact. "[I]t is well established law that [in a civil case] the attorney has complete charge and supervision of the procedure that is to be adopted and pursued in the trial of an action. . . ." (*Zurich General Accident & Liability Ins. Co., Ltd. v. Kinsler* (1938) 12 Cal.2d 98, 105, overruled on other grounds in *Fracasse v. Brent* (1972) 6 Cal.3d 784, 792.) Under this principle, "an attorney . . . may abandon a defense he [or she] deems to

25

be unmeritorious."  (*Linsk v. Linsk* (1969) 70 Cal.2d 272, 277; see *Duffy v. Griffith Co.* (1962) 206 Cal.App.2d 780, 793-795.)  An attorney who makes an informed decision to refrain from pressing a debatable point does not violate the standard of care.  (See *Blanks v. Seyfarth Shaw LLP* (2009) 171 Cal.App.4th 336, 378.)

These rules are "consistent with the adversary system's appreciation that lawyers in civil litigation must be given adequate breathing room to select whatever trial strategies they deem appropriate. . . .  [T]here is considerable judicial deference to attorney creativity in civil cases.  Admittedly the results of such creativity can be mixed with the lawyer and his or her client being rewarded in some cases and not in others. Nonetheless our adversary system requires that we allow counsel the right to maximize the use of his or her [litigation] trial skills . . . ."  (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1686.)  Consistent with these principles, courts do not allow a client to second-guess his or her attorney's litigation decisions in a later malpractice action absent expert evidence showing the counsel's litigation choices fell below a professional standard of care.

Because Hamp failed to present expert testimony showing that Harrison's failure to challenge the Third Job Description fell below the applicable standard of care, the court properly granted summary judgment on Hamp's malpractice claim.  Based on this conclusion, we do not reach Harrison's additional argument that he did not breach a duty of care because the undisputed record shows that Hamp could not perform the ready-mix driver job because both job descriptions identify regular stooping or crouching as a

physical requirement of the job, and the evidence shows that Hamp could not regularly stoop or crouch.

### III. *Breach of Fiduciary Duty Claim*

As alleged in his complaint, Hamp's breach of fiduciary duty cause of action is based on two factual grounds: (1) Harrison's failure to "protect him from fraud at the hands of the opposition" pertaining to the Third Job Description and/or aiding and abetting that fraud; and (2) Harrison's improper conduct in withdrawing as counsel in the case. In his appellate brief, Hamp additionally asserts Harrison's failure to properly communicate with him as a separate ground for his breach of fiduciary duty claim. As explained below, the court properly concluded Hamp could not recover on his breach of fiduciary duty claim under these theories.

### A. *Summary of Applicable Law*

An attorney owes a fiduciary duty to every client. (*Bird, Marella, Boxer & Wolpert v. Superior Court* (2003) 106 Cal.App.4th 419, 430.) Because a fiduciary duty may be broader than the standard of care applicable in a negligence action, a party's cause of action for breach of fiduciary duty against his or her former attorney "is a species of tort distinct from a cause of action for professional negligence. [Citations.] The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086 (*Stanley*).)

" 'The scope of an attorney's duty may be determined as a matter of law based on the Rules of Professional Conduct which, "together with statutes and general principles

27

relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which an attorney owes to his [or her] client." '. . ." (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1534-1535; *Stanley, supra*, 35 Cal.App.4th at pp. 1086.)  Although expert testimony is not necessarily required on the issue of breach of fiduciary duty (*Stanley, supra*, 35 Cal.App.4th at p. 1086), "a judge may resort to expert testimony to establish the standard of care when that standard is not a matter of common knowledge or where the attorney is practicing in a specialized field." (*David Welch Co. v. Erskine & Tulley* (1988) 203 Cal.App.3d 884, 893.)

### B. *Alleged Fraud Theory*

The validity of Hamp's first fiduciary duty theory rests on Hamp's claim that the Third Job Description was *fraudulent*.  However, as explained in the professional negligence discussion above, Harrison submitted evidence that the Third Job Description was produced in response to a discovery request and appeared valid on its face.  In response, Hamp did not submit any evidence that the job description was fraudulent, i.e., that Hanson Pacific produced it with the intent to mislead the parties and the court regarding the true facts.  Similarly, Hamp did not present any evidence that Harrison knew or should have known of any improper conduct by Hanson Pacific with respect to the Third Job Description.  Likewise, Hamp did not present any evidence that Harrison conspired with, or aided and abetted, Hanson Pacific's alleged improper conduct.  Hamp's opinions and arguments to the contrary do not constitute evidence.

Accordingly, Hamp's fraud theory underlying his breach of fiduciary duty claim is without merit.

## C. *Alleged Abandonment Theory*

### 1. *Relevant Facts*

About two months after Hamp's final deposition, in March 2009, Harrison told Hamp in an email that he had "significant concerns" regarding the merits of his case and discussed the possibility of Hanson Pacific bringing a malicious prosecution claim after an unfavorable judgment. Harrison nonetheless continued to represent Hamp through the first summary judgment proceedings, and in July 2009 prevailed in part on the first summary judgment/adjudication motion.

About seven months later, on February 12, 2010, Harrison informed Hamp that Hanson Pacific had offered Hamp $8,000 to settle his case and he " 'strongly recommended' " that he accept the offer. Hamp responded that he needed to discuss the offer with his wife. However, before he heard back from Hamp, Harrison tentatively accepted the offer without telling Hamp. Several days later, Hamp told Harrison he had decided not to accept the offer. Harrison responded that Hamp would need to " '*Fire Him*' " to preclude the settlement. However, Harrison did not fire him, and no settlement was reached in the employment case. Hamp says that at that point he learned for the first time that the court had ruled there was no dispute Hamp could not perform the duties of a ready-mix driver (in the first summary judgment ruling) and that his retained economist had opined that his financial losses were "in excess of 225K and up to 750K."

Soon after, Hamp and Harrison participated in a court-ordered settlement conference in an effort to resolve a breakdown of the attorney-client relationship. These discussions were ultimately unsuccessful. Shortly after, on April 14, 2010, Harrison filed

29

a motion to be relieved as counsel. Harrison submitted a supporting declaration stating: "There has been a fundamental breakdown in the attorney-client relationship. It has become unreasonably difficult for me to carry out my employment and to proceed in the representation in a manner consistent with my judgment and advice. As indicated to this Court previously, a decision was made [by Hamp] to terminate my firm in February, which decision was abandoned as of March 29, 2010. Given the trial date of September 17, 2010, which was scheduled by the Court at the most recent ex parte hearing to reset the case, the relief of my firm as counsel is appropriate at this juncture."

The court granted the motion on May 14, 2010. Hamp retained successor counsel and the continued trial date was confirmed.

### 2. *Analysis*

With court approval, an attorney may withdraw from representing a client while an action is pending, even if the client objects. (Code Civ. Proc., § 284; Cal. Rules of Court, rule 3.1362.) California Rules of Professional Conduct, rule 3-700 identifies grounds upon which an attorney may seek to withdraw, including (1) "The client['s] [¶] . . . [¶] . . . conduct renders it unreasonably difficult for the member to carry out the employment effectively"; and (2) "The member believes in good faith, in a proceeding pending before a tribunal, that the tribunal will find the existence of other good cause for withdrawal." (Rules Prof. Conduct, rule 3-700(C)(1)(d) & (C)(6).)

Under these rules, a trial court may permit an attorney to withdraw based on a "personality clash" between the attorney and client that leads to a breakdown in the attorney-client relationship. (*Estate of Falco* (1987) 188 Cal.App.3d 1004, 1014

30

(*Falco*).) It is irrelevant whether the attorney or the client caused the breakdown; the relevant consideration is the effect the breakdown would have on the client's legal representation. (*Ibid.*) Although a trial court may not simply " 'rubber stamp' " an attorney's withdrawal request, the court may accept the attorney's good faith representations unless the court has reason to doubt the attorney's sincerity. (*Aceves v. Superior Court* (1996) 51 Cal.App.4th 584, 592, 594.)

Applying the foregoing legal principles, Harrison did not breach any duties by moving to withdraw from the representation. Hamp had full notice of the motion, and had the opportunity to provide reasons for the court to deny the motion. There is no evidence he did so. Likewise, there is no evidence that Harrison moved to withdraw from the case for improper motives, or that Hamp was prejudiced by this conduct. Harrison took all reasonable steps to avoid prejudice to his client, including obtaining a rescheduled trial date, and there was no evidence the withdrawal actually prejudiced Hamp. Further, there is no evidence the court erred in granting the withdrawal motion.

On this record, Hamp's abandonment theory underlying his breach of fiduciary duty claim is without merit.

### D. *Alleged Failure To Communicate*

In his appellate briefs, Hamp argues Harrison also breached his fiduciary duty by failing to properly communicate with him. Specifically, he maintains that Harrison breached his duty by misrepresenting the court's ruling and failing to inform him that Hanson Pacific was relying on the Third Job Description and failing to tell him about the existence of a damages report.

31

This argument fails because these facts were never alleged in the complaint as a basis for the breach of fiduciary duty cause of action. "The complaint limits the issues to be addressed at the motion for summary judgment. . . . It is the allegations in the complaint to which the summary judgment motion must respond. [Citation.] Upon a motion for summary judgment, amendments to the pleadings are readily allowed. [Citation.] If a plaintiff wishes to expand the issues presented, it is incumbent on the plaintiff to seek leave to amend the complaint either prior to the hearing on the motion for summary judgment, or at the hearing itself. [Citation.] To allow a party to expand its pleadings by way of opposition papers creates . . . an unwieldy process." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258.) "To allow an issue that has not been pled to be raised in opposition to a motion for summary judgment in the absence of an amended pleading, allows nothing more than a moving target. For Code of Civil Procedure section 437c to have procedural viability, the parties must be acting on a known or set stage." (*Id.* at pp. 1258-1259, fn. 7.)

Hamp's failure-to-communicate claim also fails on its merits. An attorney has a duty to communicate with his or her client (Bus. & Prof. Code, § 6068, subd. (m); Rules Prof. Conduct, rule 3-500; *In re O.S.* (2002) 102 Cal.App.4th 1402, 1410-1411.) Adequate communication with clients is an integral part of competent professional performance as an attorney. (*In re O.S., supra*, 102 Cal.App.4th at p. 1411.)

In communicating the court's first summary judgment ruling, Harrison sent Hamp an email stating:

"I received word from the court that the motion was denied in part and granted in part. This is good news and, quite frankly, I think the court got it right. Our claims under FEHA for discrimination and failure to accommodate, as well as the claim for wrongful termination in violation of public policy, survive. The court granted the motion as to the harassment claim and intentional infliction of emotional distress claims were denied, so those claims will not proceed. The court also struck the claim for punitive damages, finding that the conduct of Hanson (which would require conduct of a person controlling the company as a whole) toward you was not malicious, fraudulent or oppressive. [¶] I am please[d] we were able to survive this very legitimate challenge and am happy to discuss the same with you at your convenience."

Contrary to Hamp's contentions, Harrison's explanation of the court's ruling was accurate and did not misrepresent the status of Hamp's case. None of the cases relied upon by Hamp support his contention that Harrison's explanation of the court's ruling constituted a breach of his fiduciary duty. (See *Coombs v. State Bar* (1989) 49 Cal.3d 679; *Matthew v. State Bar* (1989) 49 Cal.3d 784; *Blair v. State Bar* (1989) 49 Cal.3d 762.)

Moreover, there is no evidence showing Harrison's alleged failure to communicate with Hamp regarding the Third Job Description caused Hamp any damages. To support a breach of fiduciary duty claim regarding an attorney's conduct during litigation, the plaintiff must demonstrate that the misconduct was a substantial factor in the unfavorable result. (See *Stanley, supra*, 35 Cal.App.4th at pp. 1086, 1095; *Mosier v. Southern Cal. Physicians Ins. Exchange* (1998) 63 Cal.App.4th 1022, 1048-1049.) This requires a showing that the attorney's conduct was a substantial factor in causing the plaintiff's damage. (*Ibid.*; see *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968-969.) Even assuming Hamp was aware of the Third Job Description and requested Harrison to

33

object to this document, Hamp did not present evidence showing Harrison would or should have agreed with Hamp's request and/or that Hamp would have prevailed in the lawsuit had Harrison objected to the document.

We reach the same result regarding Hamp's claim that Harrison never told him about the retained expert's opinions regarding his economic damages. There is no showing that Harrison's failure to disclose this report had any effect on the ultimate result of the lawsuit.

### IV. *Punitive Damages*

In his appellate brief, Hamp challenges the court's ruling that there were no facts to support a punitive damages claim. Based on our conclusion that the court properly granted summary judgment on each of the claims alleged in Hamp's complaint, the punitive damages issue is moot.

### DISPOSITION

Judgment affirmed. Appellant to pay respondents' costs on appeal.


HALLER, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.